Mr. Hedrick, Mr. Hedrick, welcome. Thank you, your honor. May it please the court. Counsel. There are three issues on the appeal, and I intend to devote my time here to the second of them, which is, did the district court err in ruling that Katz and Louie had a completed conception of a biological product, even though they did not know all the claimed properties? And that really comes down to, your honors, why were they performing induction experiments? They were trying to determine whether or not you induced a differentiator, right? Doesn't that suggest that they knew what they were doing? They had a hypothesis. That finding, your honor, indeed supports the notion that the findings that they in total... You don't try to induce something unless you know it's a stem cell, right? No, you try to do... What the court's finding is on that point supports the notion that the findings show that they had a hypothesis. That is, that they had a collection of cells that could have in them a single cell that differentiated down multiple pathways. That's one hypothesis. Another hypothesis was that there were multiple progenitor cells, each of which differentiated down a single pathway. There were other hypotheses, but there were at least those two. The problem I have, though, Mr. Alcock, is the only thing you seem to muster against their evidence, and they have more than just that they were performing experiments. They have some lab notebooks. The only thing is, are these statements, these uncertain statements that you refer to, but isn't that just scientific caution? No, your honor. I mean, the way I look at it... Ever since the University of Utah invented cold fusion, we've done a little careful... Yes, your honor. But the way I look at it is if you look at the findings, and I'll get to the evidence in a second, but if you look at the findings, the findings are extremely careful in never finding that they had the mental image or that in any of those lab notebooks they actually concluded with any degree of certainty that a single cell differentiated down multiple pathways. And the reason I submit, your honor, that the findings never go that far is that the evidence of record would not support such a finding. Now, the court makes mention of the lab notebooks and the testimony surrounding them, but if you carefully go through that, there's essentially one notebook page with some ambiguous testimony in the induction media experiments that really doesn't say... This is the page divided up into the nerve cell, the muscle cell, and the fat cell. Yes, that I think is the best record evidence they have in the testimony related to that. But if you read the testimony related to that, it's not at all clear that that image was of a single cell that they were actually looking at. And what really it comes down to is that it's representative of the collection of cells that they had. And there's no question that they had a hypothesis that there may be in there a single cell. That's not a question. But the point is, is they never had more than a hypothesis. What do you think is the proper level of conviction or certainty? You stated they had an hypothesis, they weren't certain. There's a lot of room between just a working hypothesis and absolute certainty, even assuming that there's such a thing in the world. What do you think is the proper point at which you can fairly say there's conception? I think the court in Heitzman and the court in Fietchergen answers that question. And in Heitzman, the court says, In this case, however, substantial evidence supports the finding that Heitzman lacked reasonable certainty that the yeast would produce the particles recited in the claims. Accordingly, the board was correct in its conclusion that Heitzman's conception of the invention was simultaneous with his later reduction to practice. And later on, the court says, Because Heitzman failed to show that he had a reasonable expectation, I think, to the reasonable certainty standard previously articulated, that the claimed result of the biological process would occur. His conception argument can't prevail. Reasonable expectation, do you think, is a fair characterization of the level of certainty? I think that's correct, Your Honor. Although, I mean, it's a reasonable expectation of what? It kind of begs the question. But what I believe it is is a reasonable expectation that the claimed element is subjectively in the mind of the inventor. That is what I believe the test is, under Heitzman and under Fietchergen. And here, their own documents show, repeatedly, I don't know that I've ever had a case, or even seen a case, where their own documents, written starting in September of 1997, a mere four or five months after the court found conception in this case, characterized their state of knowledge as a hypothesis. But their private records, the ones other than the things that you'd be more cautious with, do show more certainty, don't they? They talk about a concept of trans-differentiation. We have that April 1997 notebook page showing the courses. Don't you see more certainty in the private record than in the public record? Absolutely not, Your Honor. There is nothing in the private contemporaneous record that establishes any degree of certainty. There is post-litigation testimony by an expert and by one of the inventors interpreting some completely ambiguous records. There is nothing in the contemporaneous record that establishes any degree of certainty. In fact, it's all the opposite. All of it establishes, at most, that they had a hypothesis that was one of the conclusions that they were looking at. I mean, even in January of 1988, they say, our initial studies to this end remain highly speculative. And even in the invention disclosure, which is in April of 1998, they merely suggest that it's a possibility. And then the committee says to them, go back and do more studies. And they do. And then, impossibly, the most powerful evidence that they didn't have a conception of the biological product in both provisional patent applications, there were only method claims. Now, this puts, I believe, the case squarely in line with endetritin, where the scientist had a method to create a biological product but didn't know that the biological product had the claimed feature. Now, here, there's no question they isolated collections of fat cells. And it turns out that those fat cells had a stem cell in it. But those provisional patent applications, I think, closed the door on they did not have the requisite degree of certainty, even in their own minds as of that point, because they limited the applications to method claims and stated in both applications that they were uncertain as to whether or not there was a stem cell. And then, in the second provisional, they say exactly what I started my argument of, Your Honors. They say, look, there were collections of cells. And as a matter of policy, Mr. Alcock, when you have a complex process that's going to require a whole lab full of graduate students to help you really reach the final result, do we want to give co-inventorship to all of those graduate students? Well, no, but that's not the situation here at all, Your Honor. I mean, here we have a circumstance where there was a lack of requisite knowledge. That requisite knowledge was only achieved in the beginning part of 2000 when, through tests, it was determined that the collection of cells, in fact, had a single, I see my time, had a single stem cell. And that is what provided the missing piece of the puzzle. And it all flows very logically that then the patent application was filed shortly after that that had, for the first time, composition plans. Thank you, Your Honors. Thank you. Thank you. May it please the Court, The UCLA researchers are asking this Court for an unprecedented finding that someone who has obtained an invention and has the ability to describe it so that it could be understood by persons of skill in the art has nonetheless not conceived of that invention. They themselves said it was speculative a dozen times. There are documents in which they use caution in describing the invention, Judge Rader, because they are careful scientists. And until they have absolute scientific proof of their idea, they're not going to say that we've established to a certainty that it's correct. But even their provisional application in 1999 says it remains unclear. And it was still not scientifically proven as of the time of the filing. But the District Court reviewed all of those documents, the full record, heard the testimony from the evidence, heard the testimony from all of the inventors, and weighed that evidence and determined to make a fact-finding that, in fact, Dr. Katz and Dewey had the definite and permanent idea that they had obtained stem cells that could be differentiated into two or more lineages. Then why did they list the others as co-inventors? Well... And invoke a presumption against you. The determination of who should be named as an inventor on a patent application is usually made by the patent lawyer, not by the individual inventors. And the inventors here aren't lawyers. They don't have an understanding of what's required to be a co-inventor. It is true that Dr. Hendrick came to the University of Pittsburgh after the invention was complete and worked with them in further describing and identifying the characteristics of these cells. So he was part of the team. So it would be perfectly reasonable for a lawyer to think that he had participated in the conception. But the fact is that that original application also included Dr. Futrell, another person from the University of Pittsburgh, who both sides agreed is not properly an inventor. So we know that the determination of inventorship that was made when the original application was filed didn't correctly reflect who the inventors on the application were. And there's no dispute on this record that Drs. Katz and Yui had obtained stem cells. They had described them in a way that a person of skill in the art could understand the properties of those cells and how to obtain them. And they had observed differentiation of these cells into multiple lineages. There's the docking injectorator you talked about earlier, where Dr. Yui observed the cells differentiating into various lineages. And he prepared a drawing that shows not a collection of cells generating these various differentiated cells, but a single cell leading to each of the three cells shown on that page. That's strong evidence, Your Honor, that in fact they had the idea that these cells, that they had isolated, were capable of differentiating into multiple lineages. The Hitzeman case that- Let me ask the same question that you did You just mentioned that they had the idea that this- What degree of confidence must they have in their idea? Well, they have to have a definite and permanent idea. So they have to have a specific- The cases say something is definite and permanent when you have a specific solution to a particular problem. You've come up with a particular solution, you have that solution in mind, and it's a permanent solution. You don't come to the point where you change your mind and say, I was wrong about that, I discard that idea. But that's later. If you look only at the theoretical moment of conception, presumably the scientist has a notion in his or her head, and a certain degree of confidence in that notion. How would you characterize the degree of confidence that is necessary? Is it enough simply to say, here's my idea of what this could be, now let's see if I can prove it. I have no idea whether there's a 2% chance, a 10% chance, or a 50% chance that that will work out. Is that enough? Judge Bryson, because conception is a subjective determination, not an objective determination, we're looking into the mind of the inventor to determine whether he thought, whether he had the idea. I'll take the subjective view, and then you have three different inventors, one of which thinks that this is unlikely but possible, that I'd like to test it, here's my hypothesis. Another thinks that it's reasonably possible that this could work out, but who knows, many things don't. And the third one, which is easy I guess, in which there's a strong belief that this will play out. If each of the three inventors has the ability to describe that invention in a way that a person of skill in the art could understand it, and appreciate that the inventor was in possession of that concept, they've all conceived of the invention. The fact that one person may be more conservative in his approach shouldn't make him less likely to be an inventor than someone else who jumps to an immediate conclusion and says, I have the idea, I'm sure it's right. It doesn't make a difference how sure they are about their idea, the question is do they have a definite and permanent idea, and can they describe that idea in a way that a person of skill in the art will understand that they are in possession of the idea. That's the relevant test. And in Petrogen we say it can't just be a research plan. Now this took a whole lab at UCLA a good deal of time to accomplish. Why wasn't this just a research plan? Because, Your Honor, they had already completed the conception when they came up with the idea and had evidence in front of their eyes that these cells could differentiate into multiple lineages. They may not have had scientific proof to the level of a peer-reviewed publication, but it's not like they didn't actually have some evidence that they observed and recorded that indicated that their idea was not only a definite and permanent idea, but their idea was actually correct. What's the distinction between a research plan and a firm settled idea? I don't think that just because you are engaged in a research plan that necessarily means you cannot have had a conception of an invention. Can you have a research plan on a settled idea? I think you can employ a research plan after you've had your firm and definite idea to develop further information. But the question is, do you have the firm, the permanent and definite idea? And can you describe that idea in a way that a person with a skill of the art appreciates that you're in possession of it? It ties into the same requirement, the written description requirement, which serves a similar purpose. Demonstrating that the inventor was really in possession of the idea. We don't want to give credit for an invention to someone who really didn't come up with the idea. But what we try to determine is whether or not the peer-reviewed inventor actually had an idea, a specific idea, and can describe that idea in a way that people with skill in the art can understand it and be in possession of it. Based on the record here and the district court's fact finding, that Drs. Katz and Huey had obtained the adipose-derived cells, had described those in a way that someone would understand they were different than other cells, described the method for obtaining them, those fact findings mandate under this court's law that in fact Drs. Katz and Huey had conceived of the invention. The Burroughs case decided by this court is completely consistent with that idea. You don't need to have proof that the invention actually works for its intended purpose. The question is, did you have the definite and permanent idea? And just like the scientists in Burroughs who didn't yet have any evidence that the AZT could actually be used to treat AIDS, in that case, they had the idea. And they described the idea, they described the compound, and they described the method of treatment, how to treat it, what the regimen was. And this court said, based on that description, you've put the person with skill in the art in possession of the invention. And whether it turns out ultimately that that invention works or doesn't work doesn't go to the question of whether there's been a conception of the invention. So this case, Your Honor, we would submit is even stronger than the Burroughs case because in Burroughs, the scientists there didn't have any evidence. There was no record evidence that they had the ability to conclude that in fact it would work. Here we've got evidence in the record that Drs. Katz and Huey saw in their work demonstrating that the cells they had isolated were in fact stem cells capable of differentiating into two or more images. You, go ahead. Could you address briefly the 15 passages? I guess that's claim 6. One of the dependent claims at issue, Your Honor, is the 15 passages claim. And the question of whether Drs. Katz and Huey had a firm and definite belief that their cells could be passaged 15 times. The question there, I take it, is that whether the district court actually found that they did have such a conception or whether the district court simply jumped from what a person of ordinary skill would have known and therefore inferred based on that alone that they didn't. And I think the factual findings are clear, Your Honor, that the district court found that Drs. Katz and Huey had the idea and corroborated that with evidence from what persons of skill in the art understood at the time. It wasn't a situation where she substituted that for a determination that the inventors had the idea. I guess this is factual finding 67, I think. Is that right? Yes. Is that the only one that addresses this point? Because as I read it, it sounds as if what the court is saying, and you can correct me if I'm misinterpreting this, the court seems to say that Drs. Katz and Huey had a definite and clear idea that cells could be passaged 15 times. So far, so good, as far as you're concerned. But then the court infers conception of this claim limitation from the fact that artisans in the field would have understood. Well, I think the dot, dot, dot may be important here, Your Honor, because it goes on to say, even in the absence of contemporaneous documentation expressly reciting the limitation by number. So the contemporaneous documentation demonstrated that Dr. Katz had passaged his cells for 13 times, but not 15 times. Oh, so you're reading the even in the absence as being saying that there were in this case such things. They had the idea that their cells were capable of passaging. But there wasn't any documentation that they had that demonstrated the 15 passages as to these cells, right? They had not. I would say they had not reduced to practice to the extent that it requires actually having passages these cells 15 times without differentiation. They had not passaged the cells 15 times. But they had passaged them 13 times, and they knew, as the testimony below demonstrated, that persons of skill in the art appreciated that one of the fundamental properties of a stem cell is the ability to self-renew. And self-renew means that it can be passaged more than 15 times without differentiating. So they knew that about cells generally, and they knew that Dr. Kaplan's cells, the bone marrow-derived cells, had the ability to be passaged more than 15 times without differentiating. They had drawn an analogy between their cells and Dr. Kaplan's cells, and based on that evidence, the district court concluded that Dr. Katz had had the idea that his cells would be capable of being passaged for more than 15 times. And he testified that he didn't think there was any reason that his cells would stop being capable of being passaged at 13. It was just an arbitrary number where he had stopped, but he had the understanding that stem cells generally have that ability, and he had demonstrated it through 13 passages. Well, he also noted in his March 20th notebook entry that he thought his cells were the same as the bone marrow cells that were well beyond the 15th, right? Well, I think that actually what he said was that he thought his cells were very similar and shared many properties. I think he was always clear that he thought his cells were different cells than the bone marrow cells, but that they were similar cells that shared a lot of properties, and he appreciated that they would have this ability to be passed at 15 times. It's a little awkward in the sense he's straddling here, because he's saying that for some purposes they're like the bone marrow cells, but for others they're not. Well, I think in his mind, he thought the cells were very similar, and he, of course, under Dow, doesn't need to appreciate whether they in fact are different or not. He had identified a particular group of cells that were derived from adipose tissue, whereas the prior cells had come from a different tissue, and the evidence now shows that in fact those two groups of cells are different in a number of different ways. Thank you. I'd like to address, back to the question Judge Bryson has now asked both of us, and address it in the context of two of the cases that have been most discussed, that is Burroughs and in Vitrogen. And I think it highlights a point that is made very articulately by Judge Lurie in his dissent in Burroughs, which is you've got to start by looking at what is claimed in order to determine the completeness of the invention. And so in Burroughs, what was claimed was the ACT compound, or the use of the ACT compound in order to treat AIDS in 5 of the 6 patents. And the effectiveness of the treatment was not claimed in 5 of the 6 patents. There's no question that the inventors had that compound in mind as of the date that they asked the other party to do some testing. And so the completeness of the conception was clearly done. They had a draft patent application as of that date. Now the 6th patent involved the claim to the effective use. An element of the claim was the effective use of the ACT. And that was not in their minds as of that date. And so the court held as to the 6th patent, it needed to be remanded for that determination. And so now we switch to Vitrogen, where just like this case, the junior party had sequenced the DNA to produce the enzyme. No question about it. That enzyme had the claimed property. No question about it. But at the time of the junior party sequencing of it, he didn't know or appreciate that it had the claimed property. He maybe thought that it did, but he didn't know or appreciate that it did. And so because that claim involved that claimed property, and not just a claim to the gene or the compound, he didn't have a complete conception. And so that brings us full circle to this case. And counsel said in this argument, and it is conceded in their papers, that it wasn't scientifically proven as of even the date of the patent applications, the provisional patent applications, it wasn't scientifically proven, it wasn't reasonably certain, that there was in fact a single stem cell in the collection of cells that they were examining. And the problem for them is that that is what the claim claimed. The claim claims a single stem cell that's adipose derived that the court construed can differentiate down multiple pathways. And if the claim did not claim that particular feature or characteristic, it would be a different case. But because it does, they needed, at the time of their claim's conception, to be reasonably certain, or have a reasonable expectation to ask what it had. And, your honors, you can read the findings, you can read the record, they did not have that reasonable expectation or reasonable certainty at any time in 97, in 98, or in 99. And it was only obtained by the UCLA researchers in the beginning part of 2000. That's why no patent application had any claim to a composition and only claimed system methods prior to that date. Thank you.